1  S SHANNON LISS-RIORDAN (SBN 310719)
2  (sliss@llrlaw.com)
   LICHTEN & LISS-RIORDAN, P.C.
3  729 Boylston Street, Suite 2000
4  Boston, MA 02116
   Telephone:   (617) 994-5800
5  Facsimile:    (617) 994-5801

6
7  *Attorneys for Respondents*

8
                    **UNITED STATES DISTRICT COURT**
9                   **CENTRAL DISTRICT OF CALIFORNIA**
10

11
   X CORP.                                Case No. 2:25-cv-02766-RGK-MBK
12
13          Petitioner,                   **RESPONDENTS' RESPONSE TO**
                                          **PETITIONERS' MOTION TO**
14     v.                                 **COMPEL ARBITRATION**

15
16 KYLE BAHR, et al.,                     Judge: Hon. R. Gary Klausner
                                          Courtroom: 850
17          Respondents.                  Date: July 28, 2025
                                          Time: 9:00 Am
18

19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   RELEVANT FACTUAL AND PROCEDURAL
      BACKGROUND ........................................................................................6

III.  ARGUMENT...............................................................................................9

      A.    The Parties' Arbitration Agreements Delegate Disputes
            Over Fees to JAMS in the First Instance, and this Court
            Cannot Second-Guess JAMS' Decision on a Section 4
            Petition..............................................................................................9

      B.    Even Were Disputes Regarding Fee Allocations *Not*
            Delegated to Arbitration, the Parties' Agreements Do Not
            Require an *Equal* Apportionment of Fees Between the
            Parties .............................................................................................15

IV.   CONCLUSION...........................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013)...................................................................................5

*California Dep't of Toxic Substances Control v. Exxon Mobil Corp.*,
    2024 WL 645417 (E.D. Cal. Feb. 14, 2024) ....................................19

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) .........................................................9

*Congdon v. Uber Techs., Inc.*,
    291 F. Supp. 3d 1012 (N.D. Cal. 2018).........................................18

*Cornet, et al v. Twitter, Inc.*,
    Case No. 3:22-cv-06857-JD (N.D. Cal. Nov. 21, 2022) ...........................6, 7

*Costa v. Melikov*,
    2022 WL 18228248 (C.D. Cal. Oct. 21, 2022) ...............................5

*Delano v. Mastec, Inc.*,
    2010 WL 4809081 (M.D. Fla. 2010)..............................................19

*First Nat. Bank of Milaca v. Heimann*,
    572 F.2d 1244 (8th Cir. 1978) ........................................................5

*Frazier v. X Corp*,
    739 F. Supp. 3d 219 (S.D.N.Y. 2024) ...........................2, 9, 11, 16

*Gadala v. Twitter, Inc.*,
    No. 3:23-cv-01595-JSC (N.D. Cal. May 15, 2023) ................................7, 12

*Goobich v. Excelligence Learning Corp.*,
    2020 WL 5593011 (N.D. Cal. Sept. 18, 2020)................................17

*Hall Street Associates, L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)........................................................................10

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019).........................................................................10

*In re Marriage of Kostelnik*,
  381 Mont. 182 (2015) .................................................................................19

*In re Marriage of Morris*,
  266 Ill. App. 3d 277 (1994) .........................................................................19

*Jones v. Starz Ent., LLC*,
  129 F.4th 1176 (9th Cir. 2025) ............................................................. 3, 15

*KOS Ltd. v. Dockery*,
  2024 WL 1129753 (Ga. Ct. App. Mar. 15, 2024) ........................................19

*Lamps Plus, Inc. v. Varela*,
  587 U.S. 176 (2019)......................................................................................18

*Ma v. Twitter, Inc.*,
  2025 WL 436636 (N.D. Cal. Feb. 7, 2025).......................................... passim

*N. Cnty. Commc'ns Corp. of Arizona v. Qwest Corp.*,
  824 F.3d 830 (9th Cir. 2016) .........................................................................4

*O'Dell v. Aya Healthcare, Inc.*,
  753 F. Supp. 3d 1155 (S.D. Cal. 2024) ..........................................................5

*Oxford Health Plans LLC v. Sutter*,
  569 U.S. 564 (2013)......................................................................................10

*Poland v. Martin*,
  761 F.2d 546 (9th Cir. 1985) .......................................................................18

*Rodriguez v. Twitter, Inc.*,
  2023 WL 3168321 (N.D. Cal. May 1, 2023).................................................7

*Rosa v. X Corp.*,
  2024 WL 4903619 (D.N.J. Nov. 27, 2024) ...................................................3

*Savers Prop. and Cas. Ins. Co. v. Natl. Union Fire Ins. Co. of
  Pittsburg, PA*,
  748 F.3d 708 (6th Cir. 2014) .........................................................................1

*Simpson v. Hand*,
  1840 WL 3924 (Pa. 1840) ...........................................................................19

*United Paperworkers Int'l Union v. Misco, Inc.*,
     484 U.S. 29 (1987).............................................................................1

*United States v. Coeur d'Alenes Co.*,
     767 F.3d 873 (9th Cir. 2014) .......................................................19

**Statutes**

9 U.S.C. § 4 .....................................................................................10

**Other Authorities**

*Merriam-Webster*, "Apportion," https://www.merriam-
     webster.com/dictionary/apportion ...............................................19

*Oxford English Dictionary*, "Apportion (*v.*)," (Mar. 2024),
     https://doi.org/10.1093/OED/5428229782 ...................................18

## I.    INTRODUCTION

Respondents are scratching their heads to figure out why Twitter[1] has moved to compel arbitration, when Respondents (Twitter's former employees) have already filed arbitration demands—and it is Twitter that has not cooperated with arbitration, preventing those cases from going forward. Respondents have thus filed Rule 11 sanctions motions against Twitter for its frivolous filings here. *See* Dkt. 27. Indeed, it is Respondents who should be moving to compel arbitration— and this Court should compel Twitter to cooperate with the arbitrations that have already been filed against it.

Twitter believes it can use this action to essentially seek an appeal of an initial ruling by JAMS that Twitter has to pay the full arbitration fees (other than the initial filing fee that Respondents have already paid). But this is not an issue that can be decided by a court. Disputes over arbitration fees are expressly delegated in Twitter's arbitration agreement to be decided in arbitration. Thus, this Court lacks the authority to decide the parties' fee dispute and instead must compel the parties to arbitrate according to the rules and decisions issued by those delegated the authority over the matter.[2]

---

[1]    In or about March 2023, Twitter, Inc. merged with X Corp., and as a result Twitter, Inc. and X Corp. are a single entity. Twitter, Inc. and X Corp. are referred to herein as "Twitter."

[2]    *See also, e.g.*, *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("Courts . . . do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. . . . [T]hat a court is convinced [an arbitrator] committed serious error does not suffice to overturn his decision."); *Savers Prop. and Cas. Ins. Co. v. Natl. Union Fire Ins. Co. of Pittsburg, PA*, 748 F.3d 708, 717–18 (6th Cir. 2014) (collecting cases)

Two separate federal courts have already come to this same conclusion when addressing this same issue as to this same arbitration agreement. *Ma v. Twitter, Inc.*, 2025 WL 436636, at *7–8 (N.D. Cal. Feb. 7, 2025) (holding Twitter was responsible for paying the arbitration fees as determined by JAMS per the agreement, which delegated the initial fee decision to JAMS, and so the court could not second-guess the arbitration provider's decision); *Frazier v. X Corp*, 739 F. Supp. 3d 219, 227–28 (S.D.N.Y. 2024) (same, while also explaining why JAMS' determination Twitter was responsible for the fees was a correct interpretation of the agreement and why the court would have reached the same conclusion as JAMS).

At the same time, very recent, binding caselaw from the Ninth Circuit also makes clear that Twitter's *sine quibus non* here — that Petitioners are "aggrieved" under Section 4 of the FAA by Respondents' conduct and that a court should second-guess JAMS' interpretation of its own rules — are incorrect. The Ninth Circuit explained in late February:

> [I]t was JAMS, not Starz, that made the decision…, so it is not clear how that decision can be characterized as a refusal by Starz to arbitrate….

("Over the years, our court and several of our sister circuits have interpreted that silence and the overall structure of the FAA to preclude the interlocutory review of arbitration proceedings and decisions….In addition to these textual and structural considerations, there are sound policy reasons—all of which support the purposes underlying the FAA—for generally withholding judicial review until the conclusion of an arbitration proceeding.").

> Jones takes issue with the fact that the consolidation order came from the JAMS National Arbitration Committee, which she characterizes as 'JAMS administrators,' rather than an appointed arbitrator….
>
> It strains credulity to believe that it is the business of a federal court to second-guess an independent arbitration provider's application of its own rule—a rule incorporated into the parties' agreement….
>
>  [N]obody here is denying that Starz's Terms contain a valid arbitration agreement or that the agreement covers the dispute at issue. Jones may be dissatisfied with JAMS's interpretation of its own rules, but the JAMS Rules are what she agreed to and she can seek recourse within those Rules. We cannot be made to do the bidding of every unhappy arbitration claimant, and especially not one who is already in arbitration. Jones's invocation of the courts' responsibility under the FAA rings hollow where the circumstances simply present no dispute about arbitrability.

*Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1181–85 (9th Cir. 2025).

This Court should not adopt Petitioners' proposed order to compel arbitration and should instead adopt Respondents', which orders the parties to arbitrate in accordance with JAMS' interpretation of the parties' agreement and its own rules with respect to fee allocations.

To do otherwise would not only run afoul of the parties' delegation of fee disputes and exceed the Court's authority under Section 4; it would also be a misreading of the parties' agreement. Indeed, as every court to address the agreement's language about arbitration fees has found,[3] even setting aside JAMS'

---

[3]    Twitter will likely rely heavily on an order from a separate court compelling a plaintiff who brought different claims against Twitter to arbitration. *See Rosa v. X Corp.*, 2024 WL 4903619, at *10–11 (D.N.J. Nov. 27, 2024), *designated as "Not For Publication,"* (granting Twitter's motion to compel arbitration against litigant who brought civil suit and apportioning arbitration fees equally, after finding litigant "appear[ed] to have waived his opportunity to rebut the arguments put forth

interpretation of the agreement, it plainly does not require an *equal* allocation of fees, even where local law does not require the employer to pay arbitration fees (as California law does here). Instead, the agreement merely provides:

> [I]n all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator.

Dkt. 1-1 at § 6.

While Petitioners press fanciful arguments about federal preemption of certain aspects of California's law, these arguments are nothing more than a red herring, and the Court need not, and should not, wade into them. *See, e.g.*, *N. Cnty. Commc'ns Corp. of Arizona v. Qwest Corp.*, 824 F.3d 830, 838 (9th Cir. 2016) (cleaned up) ("'The cardinal principle of judicial restraint is that if it is not necessary to decide more, it is necessary not to decide more.' Here, an independent source—the parties' own contract—gives [ ] the authority to compel arbitration.").

However, should the Court reach Petitioners' invented preemption issue, Supreme Court and Ninth Circuit binding caselaw, along with a plethora of California federal court decisions, make clear that California's rules requiring employers to pay arbitration fees and to suffer penalties for refusing to timely pay

---

by Twitter on this topic because he has either not provided case law or properly addressed Twitter's claims"). But, as the Court in *Ma* explained, this order contains incomplete and faulty reasoning, not the least of which is that "*Rosa* did not cite *Frazier*, nor did it address questions regarding delegation or the meaning of 'apportion.'" *Ma*, 2025 WL 436636, at *8.

such fees comport with the FAA. *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013); *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1091–103 (9th Cir. 2024); *O'Dell v. Aya Healthcare, Inc.*, 753 F. Supp. 3d 1155, 1159–60 (S.D. Cal. 2024) (collecting cases); *Costa v. Melikov*, 2022 WL 18228248, at *4 (C.D. Cal. Oct. 21, 2022) (collecting cases and endorsing the "thorough and sound reasoning" of other courts in holding provisions of California law "are not pre-empted by the FAA").

In any event, even if "applicable law" here would *not* require Twitter to pay the costs of arbitration (less the initial filing fee), the parties' agreement nowhere requires *equal* allocation to the parties of such fees. Instead, the agreement merely provides that "fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator." Dkt. 1-1 at § 6. The sole bases Twitter relies upon for its contention that the agreement itself require 50-50 fee slipping are definitions of "apportion" from select dictionaries that include, *inter alia*, the word "proportionate" or "proportionately"—which itself does not intrinsically mean "equally"[4]—and its invocation of another provision of the JAMS Rules, Rule 31(a), that expressly does not apply where, as here, employees were required to sign this arbitration agreement as a condition of employment. Mot. at 9–10.

---

[4]    *See, e.g.*, *First Nat. Bank of Milaca v. Heimann*, 572 F.2d 1244, 1249 (8th Cir. 1978) ("The term 'in proportion to' is not precise; it may mean any one of several things."); *infra* (citing cases where the term "apportioned" meant allocations that were not equal).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Regardless, because Twitter's arbitration agreements unambiguously delegate fee disputes to be decided in arbitration, this Court should compel the parties to arbitration in conformity with JAMS' interpretation of its own rules and the parties' agreement. Yet even if the Court were to wade (improperly) into the merits, JAMS' interpretations are correct, and there is simply no basis for requiring the employees to split the payment of arbitration fees with Twitter.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Since at least 2017, Twitter has included arbitration clauses in its standard employment agreements with employees throughout the United States, including the Respondents in this action. *See* Ex. A (Liss-Riordan Decl.) ¶¶ 2–4; Twitter's filings in *Cornet, et al v. Twitter, Inc.*, Case No. 3:22-cv-06857-JD (N.D. Cal. Nov. 21, 2022), Dkt. 18 at 8-9 and Dkt. 18-1 at 2 (attached as Ex. B).  The arbitration agreement requires the parties to arbitrate "any disputes arising out of or related to [an employee's] employment with Twitter, Inc. . . . or termination of employment, and survives after the employment relationship terminates." Dkt. 1-1 ¶ 1. Twitter's standard arbitration agreement for at least the past several years (and the one Respondents signed) directs that any such arbitration be brought with the arbitration provider JAMS, pursuant to the then-current JAMS Employment Arbitration Rules and Procedures. *Id.* ¶ 5.

Since Elon Musk's acquisition of Twitter in October 2022, the company has been accused of a variety of unlawful acts, including failing to pay laid off employees promised severance payments, discriminating against employees on the

basis of sex, race, age, and disability, failing to pay promised bonuses, violating the WARN Act and FMLA, and other violations. A number of employees filed class action cases in court challenging these violations. However, any time an employee who was bound by an arbitration agreement brought a claim in court, Twitter successfully moved to compel that employee's claim to arbitration.[5] This resulted in more than 2,000 of Twitter's former employees filed arbitration claims against it. Ex. A ¶¶ 5–6.

When those arbitration demands were filed, JAMS informed Twitter that it would be responsible for paying the full arbitration fees (other than initial filing fees borne by the claimants).[6] With a few exceptions, Twitter refused to pay the full arbitration fees for all employees who worked outside California, Nevada, and Oregon. Twitter did not initially object to the application of the JAMS Minimum Standards. Rather, it filed responses to employees' arbitration demands and began paying its share of the fees. Ex. A ¶¶ 2, 8. However, on June 2, 2023, Twitter changed course and objected to the JAMS Minimum Standards. *Id.*; Ex. D at 3. Twitter sent a letter to JAMS' Senior Vice President, General Counsel, Sheri

---

[5]    *See Cornet v. Twitter*, 2023 WL 187498 (N.D. Cal. Jan. 13, 2023); *Rodriguez v. Twitter, Inc.*, 2023 WL 3168321 (N.D. Cal. May 1, 2023); *Gadala v. Twitter, Inc.*, No. 3:23-cv-01595-JSC (N.D. Cal. May 15, 2023); *Borodaenko v. Twitter*, 2023 WL 3294581 (N.D. Cal. May 5, 2023); *see also* Ex. A ¶ 6.

[6]    At the outset of each arbitration, JAMS notified the parties that the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Minimum Standards") would apply, which requires the employer to pay arbitration fees other than initial filing fees. *See* Ex. A ¶¶ 8–9; Ex. C (JAMS Minimum Standards); Ex. D (Letter from Eisner dated June 21, 2023).

Eisner, requesting that JAMS' fees be shared equally by the parties for arbitrations outside California, Nevada, or Oregon. *Id.* Ms. Eisner responded on June 21, 2023, denying Twitter's request and confirming that the JAMS Minimum Standards would apply to all of these cases, and that Twitter was responsible for the full arbitration fees. *Id.* On June 28, 2023, Twitter informed JAMS that it would nevertheless refuse to pay the full fees in those cases. Ex. E (Letter from Sari Alamuddin dated June 28, 2023).

At the same time, Twitter *proceeded* with paying for and participating in arbitrations in California, Nevada, and Oregon, as well as with a small number of select arbitrations outside of these states that had already been underway by the time Twitter first decided to object to the allocation of fees. Ex. A ¶ 13. By the time Twitter filed the Petition in this matter, it had arbitrated to final hearing approximately 100 matters and received awards in 29 matters.

Faced with more than 2,000 arbitrations in line that it would need to pay for—and flying in the face of two federal court decisions to the contrary—Twitter then suddenly decided to reverse course with respect to these *California* claimants, too, now unilaterally decreeing that JAMS was wrong in its decision that Twitter would have to pay arbitration fees in California, as well as the other states to which it had been objecting to paying fees. Ex. A ¶ 14. Suddenly, Twitter claims, *it* is being prohibited from arbitrating because Respondents, in accordance with JAMS' decision, would not agree to evenly split these arbitration fees—despite, as has already been explained, there being no obligation for JAMS to order the fees to be

split between the parties. *Ma*, 2025 WL 436636, at *6–7; *Frazier*, 739 F. Supp. 3d at 230–31.

Twitter continues to press this frivolous argument, even though the court in *Ma* expressly held Twitter's arbitration agreement delegates the fee apportionment issue to JAMS; the court in *Frazier* held that even if the issue were not delegated, JAMS' interpretation of the agreement was correct; and both courts explained that Twitter could always ask individual arbitrators to apportion these fees differently once they are appointed. *Ma*, 2025 WL 436636, at *7–8; *Frazier*, 739 F. Supp. 3d at 227–31. Nevertheless, Respondents' claims have been halted until Twitter complies with JAMS' ruling that it must pay the arbitration fees it owes.

## III.  ARGUMENT

### A.  The Parties' Arbitration Agreements Delegate Disputes Over Fees to JAMS in the First Instance, and this Court Cannot Second-Guess JAMS' Decision on a Section 4 Petition

This Court cannot, by way of a Petition and Motion to Compel Arbitration, wade into issues the parties' agreement delegates:

> By its terms, the Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms.

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citations omitted). Where the parties have formed a valid agreement to arbitrate

covering the dispute, the Act requires courts to compel arbitration. 9 U.S.C. § 4;

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).

Where an arbitration agreement delegates an issue, "the sole question for [a

court] is whether the arbitrator (even arguably) interpreted the parties' contract, not

whether he got its meaning right or wrong." *Oxford Health Plans LLC v. Sutter*,

569 U.S. 564, 569 (2013). Otherwise, "[i]f parties could take 'full-bore legal and

evidentiary appeals,' arbitration would become 'merely a prelude to a more

cumbersome and time-consuming judicial review process.'" *Id.* at 568–69 (quoting

*Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 588 (2008)).

Here, the parties' arbitration agreements unambiguously delegate issues

related to fee disputes, the proper interpretation of the parties' agreements, whether

the agreements were required as a condition of employment, and all other issues

Twitter now wants this Court to wade into:

> Disputes covered by this Agreement include, without limitation,
> disputes arising out of or relating to ***interpretation or application of
> this Agreement***….[T]his Agreement also applies, without limitation,
> to ***disputes regarding the employment relationship, [and] terms and
> conditions of employment***….Except as it otherwise provides, this
> Agreement is intended to apply to the resolution of disputes that
> otherwise would be resolved in a court of law or before a forum other
> than arbitration. This Agreement requires all covered disputes to be
> resolved only by an arbitrator through final and binding arbitration
> and not by way of court or jury trial….***[A]ny [fee] disputes…will be
> resolved by the Arbitrator***.

Dkt. 1-1 §§ 1, 6 (emphasis added).

Moreover, as several different courts have explained, the parties' agreement

delegates the issue of fee allocations to JAMS in the first instance, and Twitter is

obligated to participate in and cooperate with these arbitrations by paying these fees as ordered and ceasing its conduct preventing these arbitrations from proceeding. In *Frazier*, the court explained:

> Whereas the provision Twitter relies on—and the DRA more generally—is silent on the question of interim relief, the JAMS Rules and Minimum Standards, which are incorporated into the DRA, contemplate that JAMS as an organization will have the power to make an initial ruling on this dispute. For example, the JAMS Rules provide that "[d]isputes concerning the appointment of the Arbitrator shall be resolved by JAMS," which suggests that JAMS has the authority to resolve disputes about application of the rules prior to the arbitrator's appointment. More importantly, where "an arbitration is based on an agreement that is required as a condition of employment"—which, as discussed below, this Court has determined is the case here—JAMS "Standards of Procedural Fairness for Employment Arbitration" apply. Minimum Standards § B. The Minimum Standards expressly delegate to JAMS the authority to make an initial assessment of whether the Minimum Standards are being complied with….

> This provision grants JAMS the authority to do precisely what happened here: make an initial determination about whether the Minimum Standards apply. And Minimum Standard No. 6 states that "[t]he only fee that an employee may be required to pay is the initial JAMS Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fees and all professional fees for the arbitrator's services."….

> [T]he above-quoted provision clearly implies that interim fee determinations—or at least those relating to the Minimum Standards—will be made by JAMS in the first instance, and then later reviewed by an individual arbitrator or court.

*Frazier*, 739 F. Supp. 3d at 221 (footnotes omitted) (granting petitioners' motion to compel arbitration and ordering "Twitter to pay all ongoing arbitration fees for

petitioners' claims unless and until the individual arbitrator in each of petitioners'
respective arbitrations rules to the contrary").

Likewise, the court in *Ma* explained:

> For the above reasons, the Court concludes that the DRA does not
> require any specific apportionment of fees if applicable law does not
> require the company to bear all costs…. [I]n the absence of any
> default apportionment, someone must have the authority to determine
> the initial apportionment before a case proceeds to an arbitrator.
>
> The Court concludes that the DRA delegated this question to JAMS,
> on whose behalf its general counsel was authorized to act….
>
> Accordingly, the Court defers to JAMS's determination, made by its
> general counsel, regarding the apportionment of the initial arbitration
> fees and finds no basis to evaluate JAMS's interpretation of its own
> rules. JAMS has determined that the Minimum Standards apply, and
> that determination complies with the DRA. Under Section 6 of the
> DRA, an individual arbitrator, once a case proceeds that far, may re-
> evaluate apportionment of fees—which JAMS itself acknowledges….
>
> X Corp. is therefore obligated to pay the initial arbitration fees, as
> ordered by JAMS, so that the arbitrations…can move forward.

*Ma*, 2025 WL 436636, at *7–9 (footnotes and citations omitted); *see also Gadala
v. Twitter, Inc.*, No. 3:23-cv-01595-JSC (N.D. Cal. May 15, 2023) (attached as Ex.
F) ("Plaintiff shall only be required to pay the JAMS arbitration filing fee up to the
amount she would pay to initiate an action in this Court; [ ] Defendants shall be
required to pay all other costs of arbitration[.]"). *But see Rosa*, 2024 WL 4903619,
at *10–11 (granting Twitter's motion to compel arbitration against litigant who
brought civil suit and apportioning arbitration fees equally, after finding litigant
"appear[ed] to have waived his opportunity to rebut the arguments put forth by

Twitter on this topic because he has either not provided case law or properly addressed Twitter's claims").

The court in *Ma* explained why it agreed with the fulsome and sound reasoning in *Frazier* and rejected the incomplete and faulty reasoning in *Rosa*:

> In *Frazier v. X Corp.*, the court….explained that "[w]hether the Minimum Standards apply is … a procedural issue generally reserved for the arbitrator," and that "[t]he JAMS General Counsel is, in effect, standing in the shoes of the individual arbitrator until one has ruled to the contrary." However, the court went on to explain that if it were to review the decision to apply the Minimum Standards de novo, it would reach the same result as JAMS and conclude that they apply to the agreement at issue because, even though employees could opt out of arbitration after signing the DRA, they were nonetheless required to sign the DRA as a condition of employment. Finally, the court concluded that requiring X Corp. to pay initial arbitration fees did not conflict with the DRA's provision that fees would be "apportioned" because requiring "that fees must be 'apportioned' does not dictate *how* the fees should be apportioned."
>
> Several months later, the court in *Rosa v. X Corp.* reached a contrary result…. *Rosa* did not cite *Frazier*, nor did it address questions regarding delegation or the meaning of "apportion."
>
> Having reviewed both *Frazier* and *Rosa* and considered all of the parties' arguments, this Court concludes, for the reasons discussed below, that JAMS was authorized to make the initial determination regarding allocation of fees, and that its determination did not conflict with terms of the DRA. In states where applicable law does not require the employer to pay all arbitration fees, the DRA delegates apportionment of fees to the arbitrator.

*Ma*, 2025 WL 436636, at *8 (citations omitted . For these same reasons, this Court should follow *Frazier* and *Ma* and not the incomplete and faulty reasoning in *Rosa*.

Finally, the Ninth Circuit very recently held in similar circumstances that a district court cannot second-guess JAMS' interpretations of its own rules when those rules—as here—are incorporated into the parties' agreement:

> Jones takes issue with the fact that the consolidation order came from the JAMS National Arbitration Committee, which she characterizes as 'JAMS administrators,' rather than an appointed arbitrator….
>
> It strains credulity to believe that it is the business of a federal court to second-guess an independent arbitration provider's application of its own rule—a rule incorporated into the parties' agreement—to consolidate thousands of identical arbitration demands….
>
> Jones may be dissatisfied with JAMS's interpretation of its own rules, but the JAMS Rules are what she agreed to and she can seek recourse within those Rules. We cannot be made to do the bidding of every unhappy arbitration claimant, and especially not one who is already in arbitration. Jones's invocation of the courts' responsibility under the FAA rings hollow where the circumstances simply present no dispute about arbitrability….
>
> The JAMS National Arbitration Committee is itself composed of arbitrators from the JAMS roster, so in one sense, Jones's distinction between arbitrators and administrators is exaggerated. In any case, it is inescapable that JAMS would have to make certain procedural decisions prior to the selection of an arbitrator, not least because the Terms incorporated the JAMS Rules. Rule 1(c) states: "The authority and duties of JAMS as prescribed in the Agreement of the Parties and in these Rules shall be carried out by the JAMS National Arbitration Committee ('NAC') ...." Rule 6 outlines several pre-arbitration administrative decisions that JAMS can make. Rule 11(a) conditions an arbitrator's authority to resolve disputes about the JAMS Rules on the arbitrator's being appointed, implying that at least some JAMS rules can be applied and effectuated prior to such appointment.

*Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1181–85 n.4 (9th Cir. 2025).

Accordingly, the Court should compel the parties to arbitrate in accordance with JAMS' fee determination.

### B. Even Were Disputes Regarding Fee Allocations *Not* Delegated to Arbitration, the Parties' Agreements Do Not Require an *Equal* Apportionment of Fees Between the Parties

Even if California law on arbitration fees were preempted, the law would still not require the arbitration fees to be allocated evenly between the parties. This fact should end the Court's further inquiry. The arbitration agreements' mandate, should state law be deemed void, is clear: "If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with said applicable law, and any disputes in that regard will be resolved by the Arbitrator." Dkt. 1-1 § 6. Thus, irrespective of whether California law is declared preempted, there would be no applicable law conflicting with JAMS' allocation of these fees to Twitter.

Regardless, Twitter relies on two, equally flawed arguments to argue for equal fee-splitting. While, as mentioned, the Court should not engage in its own interpretation of the contractual language and JAMS Rules to decide these issues given the delegation clauses, Twitter is nevertheless wrong on both counts.

Twitter's first argument is that the arbitration agreement was not required as a condition of employment, and so JAMS Rule 31(a) would require the fees to be apportioned *pro rata*. But again, this Court cannot second-guess JAMS' interpretation and application of its own rules. *See Jones*, 129 F.4th at 1184 ("It strains credulity to believe that it is the business of a federal court to second-guess

an independent arbitration provider's application of its own rule—a rule incorporated into the parties' agreement[.]"). And, in any event, the *Frazier* court has already explained why, despite the fact that Respondents were permitted to opt-out of the arbitration agreements (but only after being required to first sign them to commence employment), a "close reading of the Minimum Standards and JAMS Rule 31(c) makes clear that this opt-out right does not remove the DRA from the rules' scope." *Frazier*, 739 F. Supp. 3d at 228–30. Additionally, the Minimum Standards themselves make clear that the phrase refers to "a condition of initial or continued employment." Ex. C at 2. Here, employees were required to sign these contracts before beginning their employment; only after that could they avail themselves of the opt-out provisions. *Accord Frazier* at *7. Twitter's arguments that these contracts were not required because employees could later opt out is a logical fallacy — these opt-out provisions were only available to the employees *because* they signed these agreements as required, and Twitter offers no support for the proposition that a signatory is not a party to the contract just because they can effectuate a release of their obligations by following the terms of the contract.

Twitter attempts to invoke the presumption against superfluidity, but this principle cuts decidedly against Twitter's position rather than supports it. This is because the company's interpretation would render either the agreements' incorporation of the JAMS Rules (including their Fee Schedule and other provisions at issue here) or Section 6 of the agreements superfluous. In contrast, Petitioners' interpretation of Section 6—that, in addition to the purposes identified

by the *Frazier* court, this section also reflects the parties' intent to ensure that any

future changes to state laws and JAMS Rules would be automatically integrated

into their agreements—renders Section 6 non-superfluous. *Cf. Goobich v.*

*Excelligence Learning Corp.*, 2020 WL 5593011, at *3 (N.D. Cal. Sept. 18, 2020)

("As the provision anticipated, the AAA rules have changed over time.").

At the same time, the specific-governs-the-general presumption also favors

Respondents' position over Twitter's. While Section 6 provides that "[i]f under

applicable law the Company is not required to pay all of the Arbitrator's and/or

arbitration fees, such fee(s) will be apportioned between the parties in accordance

with said applicable law," it does not specify how these fees should be apportioned

if "applicable law" is silent on the matter. In contrast, the parties' incorporation of

the JAMS Rules and Minimum Standards[7] apportions the "JAMS' initial Case

Management Fee" to Respondents and "[a]ll other costs" to Twitter. Ex. C at 4.

Clearly, provisions that specify the amounts each party must pay are more specific

than those simply requiring the amounts not conflict with law.

Twitter next presses its thrice-rejected arguments that the contractual term

"apportioned" intrinsically means "apportioned evenly." But this is not so. While

Twitter cites to three (mostly old) dictionaries in support of its claim that

"apportioned" means the fees must be split evenly, a litany of additional blackletter

contract law principles, dictionaries, and cases all make this interpretation

---

[7]     Twitter befuddlingly argues the agreement does not incorporate JAMS'
Minimum Standards, but does incorporate JAMS' Employment Rules. The
Employment Rules themselves expressly incorporate the Minimum Standards and
require parties to do the same. *See* Rule 2(a).

untenable.

First, when a contractual term is unambiguous, courts must simply apply "the plain meaning that a lay person would normally attach to them," and "should not strain for interpretations to create ambiguities where none exist." *Poland v. Martin*, 761 F.2d 546, 548 (9th Cir. 1985). Courts are only to resort to dictionary definitions when a term is genuinely ambiguous. *Id.* But if this term *were* ambiguous, the doctrine of *contra proferentem* "resolves the ambiguity against the drafter [—here, Twitter—] based on public policy factors[.]" *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019); *accord Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1024 n.14 (N.D. Cal. 2018). Thus, only if the phrase "apportioned" is genuinely ambiguous are Twitter's proffered definitions relevant. But even under such circumstances, because Petitioners' interpretation of the term is also plausible, it controls.[8]

Yet even were the Court to turn to dictionaries, it is clear that "apportion" does not automatically mean a 50/50 split. While Twitter cherry-picks definitions of "apportion" from three dictionaries mostly published several decades ago (and which themselves do not stand for the proffered proposition that apportionment means a 50-50 allocation), contemporary definitions refute such an interpretation. For example, the first definition of "apportioned" in the current Oxford English Dictionary is: "To assign (*to* a person) as his or her proper portion or share; to allot." *Oxford English Dictionary*, "Apportion (*v.*)," (Mar. 2024), https://doi.org/10.1093/OED/5428229782. Similarly, Websters defines

---

[8]      Here, there is no ambiguity; apportioned means allocated.

"Apportion" as "to divide and share out according to a plan," and notes this has been the operative definition since the 15th Century. *Merriam-Webster*, "Apportion," https://www.merriam-webster.com/dictionary/apportion. Thus, even the dictionary definition of "apportion" does not support Twitter's interpretation.

Likewise, courts interpreting the word "apportioned" have consistently held that it does not require equal splitting.[9] In fact, in interpreting nearly identical language in an arbitration agreement, the court in *Delano v. Mastec, Inc.*, 2010 WL 4809081, at *6 (M.D. Fla. 2010) (citation and alteration omitted), specifically found: "[T]he arbitration agreement's provision that arbitrator and arbitration fees 'will be apportioned between the parties by the Arbitrator in accordance with applicable law' is not informative as to the likely allocation of arbitration fees."

Accordingly, even were the Court to address these delegated questions, Twitter still cannot prevail under the plain language of the arbitration agreements.

---

[9]    *See, e.g.*, *California Dep't of Toxic Substances Control v. Exxon Mobil Corp.*, 2024 WL 645417, at *4 (E.D. Cal. Feb. 14, 2024) (citing *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014)) ("However, apportionment does not necessarily need to be exactly proportional to fault."); *Simpson v. Hand*, 1840 WL 3924, at *6 (Pa. 1840) ("A]pportion' does not mean equally divided."); *In re Marriage of Morris*, 266 Ill. App. 3d 277, 281 (1994) ("Just or equitable apportionment does not necessarily mean equal division."); *In re Marriage of Kostelnik*, 381 Mont. 182, 188 (2015) ("[C]ontrary to Daniel's argument, equitable apportionment does not require an equal distribution of the marital estate."); *KOS Ltd. v. Dockery*, 2024 WL 1129753, at *5 (Ga. Ct. App. Mar. 15, 2024) (cleaned up) ("Simply put, the fact…that their fault *could* have been apportioned does not mean that the factfinder had a basis to determine the degree to which each liable defendant contributed to the damages.").

## IV.    CONCLUSION

For the foregoing reasons, Respondents respectfully request that the Court compel arbitration in accordance with the terms and rules Twitter agreed to when it agreed to arbitrate with JAMS, including JAMS' interpretation of its own rules regarding fee allocation.

Respectfully submitted,

KYLE BAHR, *et al.*, Respondents,

By their attorneys,

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, SBN 310719
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email: sliss@llrlaw.com;

Dated:        May 30, 2025

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on May 30, 2025, she filed and served the foregoing document via the Court's CM/ECF system, which will send notice of the filing to all counsel of record. Parties may access the filing through the Court's CM/ECF system.

 */s/ Shannon Liss-Riordan*
Shannon Liss-Riordan

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Respondents, certifies that this brief contains 5,600 words, which:

 X  complies with the word and page limits set by the Court's Standing Order dated April 1, 2025 (ECF No. 10).

/s/ *Shannon Liss-Riordan*
Shannon Liss-Riordan

Dated:          May 30, 2025